## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 23-10827-smr** |
| **BENTOLI, INCORPORATED,** | § | **(Small Business)** |
| | § | **CHAPTER 11** |
| DEBTORS. | § | |
| | § | |
| | § | |
| | § | |
| **BENTOLI, INCORPORATED,** | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| v. | § | **ADV. PROC. NO.** |
| | § | |
| **ALEXANDER PALENCIA** | § | |
| | § | |
| DEFENDANT | § | |

### ORIGINAL COMPLAINT TO AVOID FRAUDULENT TRANSFER

**TO THE HONORABLE SHAD M. ROBINSON, U.S. BANKRUPTCY JUDGE:**

**COMES NOW** Bentoli, Incorporated, debtor in possession ("Bentoli" or "Debtor"), and

files this Original Complaint to Avoid Fraudulent Transfer and respectfully shows:

### PARTIES

#### Plaintiff

1.      Bentoli is a corporation formed in Florida and authorized to do business in Texas

and maintains its principal offices at 116 Hoxie Street, Coupland, Texas 78615.  Bentoli is the

debtor in possession in the above-styled bankruptcy case.

#### Defendant

2.      Alexander Palencia ("Palencia") is an individual residing in Miami, Florida at 8950

Southwest 74th Court, Suite 1605, Miami, Florida 33156. Palencia does or has done business in

Texas and in this judicial district and division.  Palencia acted as a manager and a purported owner

of Bentoli and has consented to the personal jurisdiction of the state and federal courts in the state of Texas and specifically in this district and division.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This adversary proceeding is seeks relief in a case arising in the above-styled bankruptcy case under 11 U.S.C. § 548 to avoid a transfer of property of the Debtor and is a core proceeding within the Court's subject matter jurisdiction pursuant to 28 U.S.C. § 157(b) (2) (A), (H) and (O).

4.    Venue is proper in this Court. 28 U.S.C. §§ 1408 and 1409.

5.    The statutory bases for the relief requested herein are 11 U.S.C. §§ 105(a), 541(a), 544, and 548(a).

## FACTUAL BACKGROUND

6.    Bentoli is a family-owned small business.  William Robinson, Sr. began as a materials supplier to a burgeoning shrimp farming industry in the 1970s.  The Robinsons began selling other livestock feed additives and over the years developed a substantial customer base and markets in South America exporting from the port of Miami.  The Robinsons moved their operations from Minnesota to Miami and formed Bentoli, Incorporated in Florida in 1993.  Bentoli has been involved in the agribusiness industry continuously since then, developing manufacturing and selling animal feed nutritive and preservative additives, among other products, for aquaculture and livestock.

7.    Bentoli maintained its principal offices for many years in Elgin, Texas where the

company had manufacturing, warehousing and distribution facilities for its products.[1]

8.     Bentoli grew and was profitable over time.  The Robinsons formed separate affiliates in Singapore, Thailand and India to capitalize on developing Asian markets and sales affiliates in Ecuador and Mexico.

9.     By 2017, Bentoli's U.S. revenues exceeded $7 million ($20 Million globally), but that growth necessitated bringing on professional management in then CEO John Robinson's view. He hired a Global President for that role.

10.     In late 2017, John Robinson decided to resign his positions with Bentoli and agreed to sell back his interests in Bentoli under a buyout agreement effective March 2018.

11.     John provided critical financial oversight and business development direction to Bentoli during its growth in revenue and geographic reach.  Palencia is an independent businessman who conducts business from time to time through a company he owns known as Divendi Americas, Inc. ("Divendi"). Palencia first met William Robinson, Sr. in 1994 through a mutual acquaintance.  At the time, Palencia, a recent college graduate, was in Miami searching for equipment to form a business supplying equipment to maritime fisherman.  In 1995, Palencia and Robinson, Sr. formed a Miami-based business to supply Pacific fishing fleets and shrimp farming operations primarily in Ecuador. That venture ended in 2002 on good terms and Robinson, Sr. and Palencia maintained a good relationship.  After 2002, Palencia helped Robinson locate a distributor in Venezuela for Bentoli's feed products.

12.     In December 2017, Palencia met Robinson, Sr. in Madrid, Spain while on a business trip.  Robinson, Sr. informed Palencia about Bentoli's need for a near term cash infusion

---

[1] Bentoli is not currently manufacturing its own products at its own U.S. facilities after Maresma, then in control of Bentoli's financial and business operations, moved the company's offices to nearby Coupland, Texas and abandoned its Elgin manufacturing and remaining equipment.

to address cash flow issues affecting Bentoli, and imparted his concern that John's departure might negatively affect Bentoli's relationship with its credit line lender, Banesco. John Robinson had been Bentoli's primary contact and liaison with Banesco.

13. Palencia was provided and reviewed Bentoli's books and records and well understood Bentoli's financial condition. He says he concluded that the company needed a cash infusion together with a change in management, strategies and cost management to right the ship, which he concluded lacked a captain at that time.

14. Palencia held – and holds – himself out as a "director" of Bentoli beginning in January 2018 continuing through February 2022. Beginning on or about March 1, 2018 and continuing through June 4, 2018, Palencia states that he paid a total of $724,972.14 to Bentoli on seven occasions in varying amounts. On information and belief, these contributions were in the amounts needed to pay down or pay off some immediate delinquencies and obligations to critical Bentoli suppliers.

15. From the moment he became involved with Bentoli, Palencia controlled substantially all of Bentoli's financial activities and prospects. He admits that he was in charge of Bentoli's finances, record keeping, bookkeeping and accounting. At all relevant times, Bentoli acted as an officer or director of Bentoli with all the formal and informal duties that accompany those offices.

16. While he was in charge of Bentoli's finances and books as a Bentoli director, Palencia entered into self-interested business transactions involving payments to him directly, or at his direction, to his alter ego Divendi.

17. Under his control, Palencia received at least $342,748.44 from Bentoli for what Palencia characterizes as purchase order financing or "short term loans" at least 12 times between

July 2019 and July 2020.  It appears that Palencia sometimes caused these payments to be made by Divendi.

18.    Palencia or Divendi charged Bentoli a fee and sometimes charged interest on the amounts advanced.  These transactions were admittedly never documented; and varied based on Bentoli's financial exigencies of the moment.  Like almost every other interaction involving Bentoli and Palencia, there were only alleged verbal agreements.

19.    Between January 29, 2019 and November 30, 2021, Palencia or Divendi also received payments totaling at least $697,856 from Bentoli.  By his own account, Palencia received these payments once and sometimes more than once, monthly.

20.    Palencia integrated himself and Divendi into Bentoli's financial and business operations to such an extent that he became essential to the company's immediate financial viability at any time.  When the company could not pay its suppliers, on their terms, out of cash flow to obtain raw materials, Palencia provided funds through what was essentially an undocumented factoring arrangement.  He set Divendi up as the purchaser of Bentoli's essential raw materials from critical suppliers.[2]

21.    Palencia assumed effective control over Bentoli's financial and business affairs after coming on board in 2018.  But Bentoli did not flourish under his management and stewardship.  To the contrary, the company's revenues and profits reduced substantially; its need for Palencia financial support increased.  Under Palencia's control, Bentoli did not develop new banking relationships or attract new investment and the company became less healthy.

22.    COVID-19 restrictions and supply chain stresses raised costs significantly and

---

[2] Palencia says that he did this to shield Bentoli's identity as purchaser from being known in the marketplace.  But if that was a concern, it existed long before Palencia arrived on the scene.  Bentoli had been purchasing from those same suppliers for many years and had its own purchasing arrangements in place.

hampered the company's ability logistically to conduct business. In addition, a workplace accident resulting in a death at Bentoli's Elgin manufacturing offices brought unplanned financial and other pressures for Bentoli.

23.     Under Palencia's management, Bentoli became functionally insolvent. Bentoli was more frequently unable without Palencia's intervention to obtain raw materials and pay vendors on time.[3]

24.     During the same approximate four-year period when Palencia assumed responsibilities for Bentoli's financial affairs and investigating and correcting Bentoli's books and records, Bentoli's records reflected a balance sheet that incorrectly overstated the company's assets in relation to its liabilities.

25.     Bentoli's financial condition deteriorated rapidly under Palencia's watch. Palencia effectively controlled the company's financial affairs. Although Bentoli had enjoyed a good relationship with its credit line lender, Banesco and its predecessors, for more than twenty years, Banesco would not renew Bentoli's credit line without Palencia's personal guaranty. At the zenith of his influence and power within Bentoli, Palencia told the Robinsons that, despite contending a 25% ownership in Bentoli he would not renew his critical guaranty on the Banesco credit line. He made clear his desire for an immediate exit from the, by then, troubled company and that in 2022, he was simply going to walk away and allow Bentoli to stand if it could or fail without him.

26.     Palencia had attorneys at Squire Patton Boggs, LLP ("Squire") draft a so-called share redemption agreement and a promissory note to "redeem" Palencia's claimed undocumented equity interests in Bentoli, in Seaborn and in Bentoli's international subsidiaries. The attorneys at

---

[3] Palencia says that the regular meetings were needed to decide which among the bills that were owed would be paid, and which would be not be paid, based on the company's then finances.

Squire Sanders were purportedly representing Palencia in the transaction, but Squire represented Bentoli in a number of matters and been paid several hundred thousand dollars by Bentoli for legal services.

27.     Palencia set the price for the so-called redemption not based on upon any current or former valuation of the equity value of those interests.  Instead, Palencia set the price as the dollar-for-dollar repayment of every dime he had advanced to the company in 2018 ($724,972.14) and some additional debts and unreimbursed expenses Palencia claimed Bentoli owed to him, which Palencia rounded off to arrive at the round number $750,000.00.  Palencia also decided that he would be paid additionally more than $95,000 as interest through the promissory note.

28.     In addition, Palencia demanded a broad release from Bentoli as part of the "share redemption agreement."  This release was quite valuable to Palencia who had for four years while he was in charge as a director or officer been engaged in dozens of self-interested transaction without presentation to or approval from Bentoli's board.  Under his control, Bentoli had not significantly improved its financial condition; Palencia admits that he did not devote his whole time and attention to Bentoli's business, despite receiving handsome compensation.  Although Palencia nominally gave Bentoli a similar release, he didn't have any potentially valuable claims against Bentoli at the time of the transaction, save perhaps some expense report reimbursements.

29.     No prior written instruments or agreements indicate that Palencia actually owned any shares or equity interests in the subject entities, or in what amounts.  None of the customary documents that would normally attend a private equity investment (e.g., stock purchase agreement, shareholder agreement, right of first refusal agreement, etc.) exist.  No valuation of Bentoli's shares or equity was undertaken at the time Palencia paid amounts to Bentoli that he claims are equity investments.  And no valuation of Bentoli's or any affiliates' shares or equity was undertaken at

the time Palencia demanded to be paid back all amounts he had ever given to Bentoli as the purported redemption price.

30.    Because Bentoli's financial health became steadily and increasingly worse under Palencia's stewardship, Bentoli desperately needed terms to avoid the immediate consequences of Palencia's departure while it sought an alternative to Palencia.[4]  Although insolvent, Palencia's ultimatum moved Bentoli, which had no leverage and little choice, to agree to the terms Palencia demanded.

31.    On information and belief, Palencia's alleged undocumented equity shares that Bentoli supposedly redeemed had a value much closer to zero than to the 100 % "debt repayment" basis the promissory note reflects.

32.    Palencia admits that he does not actually own or hold any equity stake in Seaborn Holdings.  Instead, he says he was promised some undefined right "up to" 25% of Seaborn's common stock.  Whatever else can be said about the purported inchoate right to receive equity in a never used restructuring vehicle part of an abandoned restructuring plan, it is worthless. Nevertheless, if he ever had the right at all, Palencia purported to transfer it to Bentoli as material consideration for some part of $750,000.

33.    With respect to Bentoli's "domestic and international affiliates" Palencia claims neither equity ownership nor a promise of equity.  Instead, he purported to convey through the share redemption agreements, "certain [but unspecified] rights to the equity ownership of these affiliates."  These amorphous rights, whatever their nature, were worthless.  But Bentoli became liable to pay for them through the  $750,000 note.

---

[4] Prompted by Palencia's announcement that he would depart Bentoli, Bentoli  was discussing a possible arrangement for investment with Frank Maresma, a childhood friend of Edward Robinson.

34.     Certainly the value Bentoli became obligated to pay was not reasonably equivalent to the real value of the interests it received.

35.     Palencia at all times relevant believed, asserted he was, and acted as, a director or officer of Bentoli with the duties that accompany those offices. Nevertheless, Palencia put his interest in front of Bentoli and its other actual owners.

36.     Palencia was the one person, by his own choice, responsible for managing and correcting Bentoli's books and records. A sophisticated businessman with a financial background, he well understood, or should have, the importance of documenting transactions between the company and its shareholders, directors and mangers acting individually. But in all of those roles, he conducted his financially significant individual deals and dealings with Bentoli all on amorphous alleged "verbal agreements."

37.     Although Palencia and the company did not obtain, or even perform, any valuation of Bentoli or its subsidiaries or the nature, restrictions on or redemption value of Bentoli's so-called shares, it is not plausible to believe that Palencia's claimed 25% stake, even if true, in a functionally insolvent entity with true assets less than its liabilities at redemption, no viable long-term banking relationships, and who depended on Palencia for its cash flow in undocumented "factoring" transactions that it would lose on his exit, could be fairly valued at the risk-free full amount of every penny Palencia contributed grossed up by some miscellaneous debts.

## CLAIMS FOR RELIEF

### COUNT I
### 11 U.S.C. § 548-FRAUDULENT TRANSFER

38.     The Debtor adopts and incorporate by reference the allegations in foregoing paragraphs 1 – 37 as if set forth in full herein.

39.     Bankruptcy Code § 548 authorizes a debtor in possession, including the Debtor here, to avoid any voluntary or involuntary transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor made or incurred on or within two years before the petition date if the Debtor received less than a reasonably equivalent value for the transfer or obligation and was insolvent when the transfer was made or the obligation incurred and or became insolvent by reason of the transfer or obligation.

40.     Palencia and Bentoli executed the Share Redemption Agreement and related promissory note on February 22, 2022 within two years of the petition date.

41.     Through that agreement, Palencia was to receive $750,000 plus another more than $95,000 in interest for shares of Bentoli that are likely not evidenced by any stock certificates and by admission were not acquired pursuant to a written stock purchase agreement or other documentation customary in such private investment transactions.

42.     Bentoli is, and was then, a closely held family-owned corporation.  There was no regular market for Palencia's purported undocumented minority shares or interest.  Throughout Palencia's stewardship, Bentoli was unable to attract new working capital on acceptable terms and the company was in relatively the same financial condition as when Palencia arrived on the scene. Moreover, under Palencia's financial stewardship, the company maintained a balance sheet that substantially overstated its assets and their real value.

43.     No valuation of Bentoli or its equity shares was ever performed.  As a fiduciary to Bentoli, and a purported director in charge of the company's financial affairs Palencia was responsible to ensure that any redemption was for a price and on terms just and reasonable after fully disclosing all material facts.

44.     Moreover, it is far from clear that Palencia actually owned any of the interests he

purportedly conveyed to Bentoli through the share redemption agreement.

45.    No Bentoli shares or share certificates were ever issued by the company to Palencia. No capitalization table identifies Palencia as a share owner.

46.    There appears no written agreement between Palencia and any Bentoli shareholder through which Palencia did or could acquire all or some of that individual's Bentoli shares or interests.  There is not even evidence of the terms of a complete oral agreement between any such individuals.  And there is not even a suggestion that Palencia paid any money to those individuals.

47.    No promissory notes exist reflecting any convertible debt and there are appear to be no written documents or agreements by which any indebtedness of the company to Palencia was converted.  Palencia has admitted as much.

48.    There appear no resolutions or other records of corporate actions by Bentoli authorizing the issuance of shares or the conversion of debts.

49.    Whether or not Palencia was promised he would be made a shareholder, as he asserts, promises, even if specifically enforceable, are not shares; Palencia could not transfer never-issued shares he did not own and his purported transfer was no consideration.  In § 548 parlance, Palencia's agreement to convey interests shares that were never authorized or issued and that he did not own were worthless.

50.    Bentoli also transferred significant value to Palencia in the form of a general release of potential claims arising from Palencia's dealings and transactions with Bentoli, for which the company received nothing, or near nothing of value in return.

51.    Palencia did not at any time make any effort to determine the fair value, or any value, of Bentoli shares he claims he acquired, much less the choses in action, real or otherwise, described in the share redemption agreement.  That value never mattered to Palencia; he was out

to be made whole like a lender, dollar for dollar without risk, for every nickel he ever contributed to or expended for Bentoli, plus interest, but in the guise of a share redemption.  That is precisely what the redemption arrangement he imposed on Bentoli accomplishes.

52.     Bentoli was insolvent before and on the date of the share redemption agreement. Moreover, Palencia's departure saddling the company with $750,000 more in debt—to him—was sure to deepen Bentoli's insolvency. Palencia knew that his departure made Bentoli's financial condition less certain and more perilous.  Palencia knew or should reasonably have believed that in taking on large additional debt to him, Bentoli would incur debts beyond Bentoli's ability to pay as they became due.  In the end, that happened.

53.     If Palencia's interests are, in fact, established to be equity interests, then the share redemption agreement, its incorporated general release and the attendant obligation that Bentoli incurred evidenced by the promissory note transferred significant value to Palencia for which Bentoli did not receive a reasonably equivalent value in exchange.

54.     Palencia is the initial transferee of the promissory note and shareholder redemption agreement and has not endorsed or transferred those instruments to any other immediate or mediate transferee.

55.     Bentoli was insolvent before and at the time of those transfers or rendered insolvent by them.  Accordingly, the transfers should be avoided under § 548 and Bentoli should recover the promissory note pursuant to § 550.

## COUNT II
## 28 U.S.C. § 2201—DECLARATORY JUDGMENT

56.     The Debtor adopts and incorporate by reference the allegations in foregoing paragraphs 1 – 55 as if set forth in full herein.

57.     28 U.S.C. § 2201 authorizes this court to "declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be sought."

58.    An actual dispute and controversy exists between Palencia and the Debtor concerning the rights and status of the parties.

59.    Palencia claims that he owns or owned equity shares in Bentoli, which he demanded that Bentoli "redeem" from him.  Although there is no dispute that a Bentoli officer signed the share redemption agreement Palencia presented and a related note, a real and important controversy exists concerning whether Palencia owned equity interests and the other inchoate undefined interests he purported to convey.

60.    As set forth in the foregoing Count I, although there are competing contentions, it is not disputed that there are no contemporaneous agreements to reflect the sale or issuance of Bentoli shares to Palencia by Bentoli or anyone else.  There are likewise no contemporaneous agreements, board actions or consents concerning the personal rights to have or hold shares in Seaborn or the unidentified international affiliates Palencia's attorneys described in the share redemption agreement that Palencia had prepared and imposed on Bentoli when Bentoli's only available course was to accept without question.

61.    It is essential for the purposes of determining this litigation and for Bentoli to reorganize in bankruptcy, that the Court enter ancillary relief determining whether Palencia actually owned any worthless equity interests he purported to convey in exchange for $750,000 and a valuable release, or *vis a vi*s Bentoli is a simple creditor who advanced funds to pay operating bills in 2018.

## COUNT III
## 11 U.S.C. § 510(b)—SUBORDINATION OF CLAIM

62.    The Debtor adopts and incorporate by reference the allegations in foregoing paragraphs 1 – 61 as if set forth in full herein.

63.     Alternatively, to the extent that it is determined that Palencia did hold equity in Bentoli, and that such equity was redeemed in exchange for Bentoli's execution of the promissory note, Palencia's claim should be subordinated to all general unsecured claims, because any claim for damages arises from the purchase or sale of securities in Bentoli.

64.     11 U.S.C. § 510(b) provides:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

65.     11 U.S.C. § 510(b) subordinates claims of a claimant for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities.

66.     Any claim of Palencia for damages as a result of the promissory note seeks damages arising from the purchase or sale of securities in Bentoli, and must be subordinated to the general unsecured creditors pursuant to 11 U.S.C. § 510(b).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Debtor prays that summons issue commanding Defendant to appear, and that upon hearing the Debtor have judgment pursuant to 11 U.S.C. § 548(a) (1) (B) and § 550 against Defendant:

a.  Declaring that Bentoli did not own and never acquired any equity interest in Bentoli.

b.  Avoiding and voiding the $750,000 obligation evidenced by the promissory note dated February 22, 2022 and related share redemption agreement.

c.  Alternatively, to the extent that the promissory note is not avoided, it should be subordinated to general unsecured claims;

d.  Awarding Bentoli its costs in accordance with law; and

e.  Awarding Bentoli such other and further relief, in law or in equity, to which the Debtor may be entitled.

Dated:  October 1, 2023.

Respectfully submitted,

*/s/ Brian S. Engel*

**Brian S. Engel** (SBN 00789279)
**Barrett Daffin Frappier Turner & Engel, LLP**
4004 Belt Line Rd., Suite 100
Addison, Texas 78620
Phone: (512) 687-2503
Fax: (512) 477-0008
brianen@bdfgroup.com

**SPECIAL LITIGATION COUNSEL FOR BENTOLI, INC., DEBTOR IN POSSESSION**

RONALD J. SMEBERG
State Bar No. 24033967
THE SMEBERG LAW FIRM, PLLC
4 Imperial Oaks
San Antonio, Texas 78248
210-695-6684 (Tel)
210-598-7357 (Fax)
ron@smeberg.com

PROPOSED ATTORNEY FOR DEBTOR